## W. C. AULD v. J. B. WALTON.

Whatever may have been the authority of a Commissioner of Election to inquire into the evidence of citizenship of a voter, prior to the passage of the Act approved the 20th of March, 1856, entitled " an Act providing for the Registry of the names and residence of all the qualified electors of the city of New Orleans, according to Article-eleventh of the Constitution of the State," he has no such power as the law now stands.

By the said Act of March 20th, 1856, an officer is created having authority to receive and consider the proof of citizenship of any person desirous of exercising the elective franchise in New Orleans, and proof being made according to certain rules and forms of evidence set forth in the statute, to enregister the name of the applicant as a qualified elector, and to deliver him a certificate.

This certificate is, by law, full proof of the right to vote at the day of its date of the person named in it, and no person can vote in New Orleans who is not the bearer of a certificate of registry.

The office of Register, under the statute, is a special tribunal for the trial of the right to vote in New Orleans; and the certificate is in the nature of a judgment, which is not subject to revision by the Commissioners of Election.

These judgments of the Register are, however, subject to revision. The 9th section of the Act provides a mode of redress, by a suit against the Register, for an applicant to whom the Register shall refuse a certificate. And the validity of the certificate, and the sufficiency of the proof upon which it was based, may in all cases be examined upon the contest of an election, by the tribunals seized of the jurisdiction of such contest.

Where the registry of the vote is more than three months old, and there is no change of domicil endorsed upon the certificate, the vote may be challenged upon the ground that the voter has changed his domicil since the date of the registry, and by such change of domicil has lost his vote in that precinct. Upon such challenge being made, the Commissioners of Election may lawfully swear the voter as to the fact of his change of domicil.

APPEAL from the First District Court of New Orleans, *Robertson*, J. *Benjamin, Bradford & Finney* and *George S. Lacey*, for plaintiff and appellant. *Randell Hunt* and *L. M. Day*, for defendant.

BUCHANAN, J. On the 5th of November, 1855, a general election was held in the city of New Orleans for the choice of State and parish officers by the people. The votes were received at twenty-three distinct election precincts, fixed by the common council of New Orleans, in conformity to section sixth of the Act relative to Elections, approved March 15th, 1855.

The following were the officers to be elected: Governor, Lieutenant Governor, Secretary of State, Auditor, Treasurer, Attorney General, Superintendent of Education, Representatives in Congress, State Senators, Representatives in the State Legislature, Sheriff, Coroner, District Attorney, Clerks of Court, Assessors, Tax Collectors, Justices of the Peace and Constables.

The districts of election for some of these officers included all the precincts, for others but a portion of them; but in each and every precinct, one or more officers of each of the above denominations was to be voted for (among them, six Clerks of Court), and in two ballots : the vote for Justice of the Peace and Constable in one, and the vote for any or all of the other officers named in another ; two ballot boxes being furnished, as directed by law, to each election precinct for the reception of the votes ; one box in which to deposit the votes received for Justice and Constable, and one box for the votes cast for the other officers voted for.

At all of the twenty-three precincts the votes were received up to the hour fixed by law for closing the poll ; when the ballot boxes were opened and the three Commissioners of Election, assisted by the two Clerks appointed and

17

Auld
v.
Walton.

sworn in each precinct, proceeded to count and record the votes polled for each candidate. In twenty-one out of the twenty-three precincts, the counting was completed and recorded, and the result ascertained without any obstruction. But at two of the precincts, the seventh and ninth, after the counting of the votes had commenced and before it had been completed, the polls were invaded by mobs, who snatched from the hands of the Commissioners of Election the ballot boxes and ballots, and from the hands of the Clerks of the election the lists of voters and the tallies which they were occupied in keeping, and consigned ballots, ballot boxes, lists of voters and tallies, to an indiscrimate destruction.

Returns of the votes polled in all the precincts, except the seventh and ninth, were made to the proper returning officer. From the seventh precinct no returns were made. From the ninth precinct, there was a return of the vote for Justice of the Peace and Constable, but no return of the vote for the other officers.

Among the officers which it was the purpose of this election to fill, was that of Clerk of the Fourth District Court of New Orleans. The only candidates for that office were the plaintiff and the defendant, the nominees respectively of the *Democratic* and of the *American* parties. The returns of the twenty-one precincts, at which the vote was fully counted, as certified by the Commissioner to the Sheriff, and by the Sheriff to the Secretary of State, gave collectively to *Mr. Walton*, the defendant and the "American" candidate, a majority of two hundred and two votes over his opponent *Mr. Auld*, the plaintiff, candidate of the "Democratic" party ; and the present action is a contest of defendant's right to the office, according to the forms and within the delays prescribed by the Act of 15th March, 1855, relative to elections.

The petition of the contestant, *Mr. Auld*, sets forth the following grounds of contestation :

1st. "At the seventh precinct there were polled, in my favor, legal votes sufficient to give me a majority of at least two hundred and twenty votes at said precinct, which votes have not been returned to the Sheriff by the Commissioners, for the reason that before the Commissioners had finished counting all the votes given for the several candidates at said precinct, and before they had been able to make up their returns, the room in which said Commissioners were employed in counting said votes and making up said returns, was violently invaded by a band of lawless men, who destroyed the ballot boxes, the votes, the lists of voters, and the other papers and documents of the said Commissioners, although the count had progressed sufficiently far, of the vote cast for the said office of Clerk of the Fourth District Court of New Orleans, to enable said Commissioners and their Clerks to ascertain that there was a majority of at least two hundred and twenty votes of legal voters in favor of myself.

2d. "At the ninth precinct there was a large majority of legal votes given in my favor, the exact number of which I cannot specify, which votes were not returned in my favor by the Commissioners, because they were hindered from counting said votes and making the returns thereof, by the violent interruption of a band of lawless men, who destroyed the ballot boxes with their contents, and the list of voters, so as to render it impossible for the said Commissioners to make the returns required by law.

3d. "At the twelfth precinct there was an error in counting the votes in the ballot boxes, and in making the returns of the count, which error resulted to my injury and disadvantage to the amount of twelve votes.

4th. "At all of the precincts in the city except the fourth, a large number of legal voters, who tendered their votes in my favor, were rejected by the Commissioners and their votes refused, because they did not produce their certificates of naturalization, which the Commissioners arrogated to themselves the power of demanding, although no such power is granted them by law, and although said voters offered to take the oath required by the fourteenth section of the Act of the 15th of March, 1855, entitled an Act relative to Elections.

5th. "At all the precincts in the city except the fourth, large numbers of legal voters, who tendered their votes in my favor, were rejected and their votes refused, after they had complied with the illegal and unauthorized demand of the Commissioners for the production of their certificates of naturalization, and after taking or offering to take the oath required by the fourteenth section of the Act of the 15th of March, 1855; the said Commissioners giving no reason or pretence for the said refusal, except the illegal and frivolous pretext that they had the right to disregard and consider as null the judgment of courts of record whenever, in the opinion of said Commissioners, said judgments were erroneous.

6th. "That the persons whose names are set forth in the papers hereto annexed, and marked A and B for greater certainty, together with many other persons whose names will be hereafter produced, were on the said day of the election legal voters of the parish of Orleans, and entitled to vote in the respective precincts set forth immediately above their names; and that on the day of said election they did tender their respective votes in my favor, at the respective precincts where they were entitled to vote, and that they were not admitted to vote, and that the votes were refused by the Commissioners, although they offered to take the oath prescribed by the fourteenth section of the Act of the 15th of March, 1855, entitled an Act relative to Elections, and although many of them did take the said oath, and did exhibit also, in compliance with the illegal demand of the Commissioners, their certificates of naturalization duly issued in conformity to law, and that said votes were rejected solely on the illegal and unjust pretext set forth in the fourth and fifth grounds aforesaid.

7th. "That at the third precinct there were three legal votes in my favor; at the eighteenth precinct one legal vote in my favor; at the twenty-third precinct five legal votes in my favor, and at the tenth precinct one legal vote in my favor; all for said office of Clerk of the Fourth District Court of New Orleans; which were delivered by legal voters and received by the Commissioners of said respective precincts, which were not counted by the said Commissioners and not included in the returns, because, by accident or mistake, on the part of some one of the said Commissioners, they were deposited in the ballot box kept for the reception of votes for Justice of the Peace and Constable.

8th. "There was error to my prejudice in adding up the tally lists at all the precincts, the said additions showing a smaller number of votes in my favor, and a larger number in your favor, than would have appeared if the tally lists had been correctly added.

9th. "The grounds above set forth will, when proven, suffice to overcome the majority which I learn will be shown by the returns already made, the said majority being only two hundred and two votes."

The petition concludes by a prayer for citation and for judgment, decreeing that petitioner and not the defendant, *James B. Walton*, was duly elected Clerk of the Fourth District Court of New Orleans.

Defendant pleaded the general issue, averred that he was the Clerk elect by a large majority, and that his majority would have been much larger had not the Commissioners of Election received votes for contestant of persons not legally naturalized and not entitled to vote.

Upon this issue the parties went to trial before a jury who found a verdict, by a majority of seven to five, "that *J. B. Walton*, the defendant, was duly and legally elected to the office of Clerk of the Fourth District Court of New Orleans."

A new trial was prayed for, which the District Judge refused to allow, (" although inclined to the opinion that the verdict was contrary to the law and the fact,") inasmuch as the forty-fifth section of the Act of 1855, relative to elections, declares that the court shall have no power to grant a new trial in a case of this kind.

The counsel of plaintiff has brought to our notice a contradiction between the English and French texts of this section quoted by the Judge of the District Court. For while the English text reads as stated by the learned Judge, the French text seems to declare directly the reverse. In this contradiction of the two texts, we cannot say the Judge erred in adopting that which most promotes the end which the Legislature seem to have had in view in this statute, namely, a speedy determination of this class of cases.

The cause is now before us on the appeal of the contestant, under the Acts of 1856, pages 9 and 117, with the same latitude of control as was possessed by the jury under the forty-fifth section of the Act of 1855.

Counsel on both sides seem agreed in relation to two general principles of the law of contested elections:

1st. "That the official return is *prima facie* evidence of the legality of an election."

2d. "That the *election* and not the *return*, entitles the party to the office, and that in a suit of this character, the court can go behind the return to ascertain the true canvass." *People* v. *York*, 14th Barbour's New York Rep.

The burden of proof is upon the contestant (in the words of his ninth ground) "to overcome the majority shown by the returns already made, of two hundred and two votes" against him.

He proposes to do this by two different kinds of evidence:

1st. Of votes received at the polls, but not counted.

2d. Of votes offered at the polls and which ought to have been received, but were not received.

No question is made of the admissibility of the first kind of proof. The argument in relation to it, turns exclusively upon the credibility and effect of statements of witnesses to some extent conflicting.

The second class of evidence offered, involves many and intricate questions of law, but little or no contradiction as to facts.

The principal evidence of the first class is that in relation to the destruction of the ballots at the seventh and ninth precincts, and the state of the vote at those precincts at the close of the polls; and our attention must first be directed to the testimony given by the witnesses upon this subject.

The destruction of those ballots was a crime committed by persons unknown, which both plaintiff and defendant deplore, and in the commission of which there is not the slightest hint of suspicion, in the pleadings or in the evidence, that either of them had any complicity. Both parties admit that a large num-

ber of votes was received at the two precincts in question. Both parties admit the propriety and necessity of secondary evidence of that vote, to come in aid of the partial returns of election which have been made; and to assure the possession of the office in contest to that candidate who has in truth been elected to fill it. The only dispute on this branch of the case is, whether the testimony adduced has accomplished this object. On the part of plaintiff, it is insisted that the state of the poll at the seventh and ninth precincts is established with sufficient certainty by the evidence. On the part of defendant, it is contended that the data are insufficient for that purpose. As to the occurrences at the seventh precinct, we have the testimony of the three Commissioners, *William Christy, Samuel Locke* and *Charles H. Horton;* of the two Clerks of the precinct, *D. Mitchell* and *C. D. Raney;* of the Deputy Sheriff at that precinct, *T. D. Harper;* and of a citizen, *T. J. Hitzelberger.*

All these witnesses agree that the total number of votes received at the seventh precinct from the opening to the closing of the poll was *eight hundred and ninety-four*, except *Hitzelberger*, who does not mention the number.

They all agree that, when the hour arrived for closing the polls the Commissioners opened, first, the ballot box containing the ballots polled for the State and parish officers, other than Justice and Constable, and commenced ascertaining the result of the election, as to those officers, by unfolding the tickets and distributing them into three piles; one pile being composed of printed tickets, headed "Democratic," which had no name erased or written upon them. This is called by the witnesses "the straight Democratic ticket." Another pile was composed of printed tickets, headed "American," which had no name erased or written upon them. The witnesses call this "the straight American ticket." A third pile was formed of "scratched" or "split" tickets.

The important operation of counting the votes was next in order; and as this is the point where the witnesses sunder, it becomes indispensible to trace, step by step, the testimony of each. We take them in the order in which they stand in the record.

*D. Mitchell* says, " *Colonel Christy* counted out, one at a time, without calling the names on the ticket, the number of straight American tickets, amounting to 299, and told me to put that down as the number of straight American tickets. *Mr. Locke*, in like manner, counted the straight Democratic tickets, amounting to 509. The split tickets were called off, the names on each ticket, and tallied by the clerks. On those the different candidates had different majorities. These tickets were then put back in the ballot box, and locked up by *Colonel Christy*. Then they commenced opening the box of Justice of the Peace and Constable, and began to assort the tickets in the same manner as they had done for the others; and they had counted out those for Justice of the Peace and Constable, tickets that had the names of *Mr. Bradford* and *Mr. Agaisse* on them, and they had counted about 140 of the tickets having the name of *Mr. Cuvillier* and *Mr. Kearny*, when the mob came in, took the ballot boxes and the other tickets that were then on the table, also all the tally lists and lists of voters, and carried then out into the street, and that is the last I saw of them."

*Mr. Raney* says, " *Colonel Christy* then proceeded to examine the straight American tickets, counting from one to one hundred. When he got through, my memory does not serve me what the number of the straight American ticket was. In counting the straight American tickets, they were taken out one by

Auld
v.
Walton.

one from one hat and put into another. When he got to one hundred I put down on my sheet the figure 100, and so on until he got through. After they got through the straight American ticket, *Mr. Locke* proceeded to count the straight Democratic ticket in the same manner as *Colonel Christy* did the straight American ticket, and I kept the tally in the same manner." "My memory does not serve me now so as to state the number of straight Democratic tickets." "The scratched tickets were then called off by *Mr. Locke*, and each name tallied up by the Clerk. After we had got through tallying the scratched tickets, the whole of the tickets, straight American, straight Democratic, and scratched, were then placed back together in the box, either by *Mr. Horton* or *Colonel Christy*. 1 mean, they were placed in the same from which they had been taken in the first instance, and the box was locked up. We then proceeded to open the Justice box and assort the tickets in the same manner as in the State box, placed them in three different piles, one pile in a hat, one pile in a basket, and one pile in a bucket, the same receptacle which had been used for the State tickets. *Mr. Locke* then proceeded to count the straight Democratic tickets for Justice of the Peace and Constable. They were counted in the same manner as the State tickets. While the Commissioners were counting the Justice's box *Mr. Mitchell* and myself were then adding our tally list to make our report for the State ticket and the vote for each candidate on the scratched ticket together, and the result had been extended. The result for Sheriff and for Governor had been announced. While the Commissioners were counting the Justice's box the mob broke in, blew out the lights, seized the tally sheets, the ballot box, one of the round tables, took them out in the middle of the street, then made a fire of the whole of' it. This took place at about half-past eleven o'clock p. m."

*Samuel Locke* says, "After the closing of the polls we proceeded to open the State box. There were two boxes, one for Justice and Constable, and the other for all the officers mentioned in ticket marked B. We proceeded to straighten out and assort the tickets, putting the Democratic clean unscratched tickets into a champagne basket; putting the clean unscratched American tickets into a hat; all tickets that were scratched or not throughout a party ticket, were put into another hat." "I counted the clean Democratic tickets, *Messrs. Christy* and *Horton* looking over me to see that I counted right. There were 509 of them. *Mr. Christy* counted the clean American ticket, I looking to see that he was counting right. There were 299 of them. There were 85 scratched tickets, and one blank ticket. I called off all the names on the scratched tickets. The Clerks kept the tally. *Mr. Horton* looking over me and taking the tickets to see if I called them right. Some of them had the Governor scratched, some the Sheriff, and others other candidates."

"After the ballots had been assorted, counted and tallied, they were all put together in the State ballot box by *Mr. Christy*, who pressed them down to get them in. The box was locked by him, and the key put in his, *Christy's*, pocket, and he remarked that we had done with them, and his plan had been carried out, that is, in counting the ballots instead of tallying each name. We then proceeded to open the Justice's box, straightened out and assorted the tickets in the same manner; and we found three State tickets in these, two American tickets and one Democratic ticket. The Clerks were ordered to add these to the count. The account I have given of the number of votes for each party was made up then, these votes being counted. *Mr. Christy* opened the

State box, and put then those tickets into it, and put the key back in his pocket. Just previous to adding these three ballots, the Clerks had announced the majority for the Governor and the Sheriff. We proceeded to count the Justice's votes in the same manner as we had done the State tickets; *Mr. Christy* counting the American vote for Justice and Constable, and there were 299 votes, and I was counting the Democratic votes when the mob got in and destroyed them."

*T. D. Harper* says, "After closing the poll the votes were separated, as be. fore stated by *Mr. Locke;* they finished counting; all the State tickets were placed by *Colonel Christy* in a box, and locked up by him; the Commissioners had commenced counting the votes for Justice and Constable. The whole number of votes was 894—567 for *Bell*, 318 for *Hufty*. Heard *Colonel Christy* announce the majority for Sheriff, also *Mr. Locke*. This was about an hour before the mob broke in." "Witness did not add up the tally lists. It was done by the Clerks." "When they had finished counting the three piles of State tickets, they were put by *Colonel Christy* in the State box, were pressed down by him, and the box locked by him with the remark "that is now done with." This box was afterwards opened to put into it the tickets which had been found in the Justice's box. *Colonel Christy* then requested *Mr. Locke* to relieve him, as he was tired, and count the tickets in the Justice's box."

*William Christy* says, "At the closing of the polls, the tickets were divided into three parcels. Those headed 'American' were placed together, and those headed 'Democratic' placed together, and those *scratched* were placed together, with the view of facilitating us in calling off the names of candidates, none of which had been called off except those upon the split tickets. These bundles of tickets were made expressly with reference to their heading. The assorting these tickets and piles was done with great rapidity, and not a name was examined by any of the Inspectors, and so far as I was concerned, I did not examine a single name upon a single ticket thus assorted, nor did any of the other Inspectors to my knowledge. The three Inspectors assorted all of the tickets. Each took a handful of the tickets, examined the heading, and placed each ticket on its proper pile. *Mr. Locke* then counted the number of tickets headed 'Democratic,' and I counted those headed 'American.' The number of each was announced, and I ordered it to be put upon loose sheets of paper by the Clerks. We then proceeded to call off all the names upon the eighty split tickets, and, as before stated, those were all the names that were called off and tallied." "This arrangement of the tickets into piles was a preliminary step, taken by us merely to facilitate the counting, and was not intended by the Commissioners to be the final counting of the votes. This was done at my suggestion. I did not see the name of *Mr. Auld* or of *Mr. Walton* upon any of the tickets in either pile, except that of the split tickets which was counted. After the distribution of the tickets, I put the American tickets which I had counted back into the ballot box. Those headed Democratic were placed in a champagne basket, and those which were split were placed in a bucket, with the view of a final examination and calling off. While we were counting the votes of Justice of the Peace, and before we had touched the others, the boxes were destroyed. We did not, I am positive, put all the tickets, American, Democratic and scratched, back into the box, and lock the box up. I did not lock the box containing the tickets headed 'American,' nor touch the key. I could not have made a return at any time since the election showing the num-

ber of votes received by any one candidate at that precinct. The ticket boxes and every scrap of paper that was on the table disappeared in about five seconds after the mob entered, and the last I saw of them they were burning in the street." "The total number of votes cast at that election precinct was, I think, 894. I am not positive, but that is my impression of the number. I do not know how many tickets were said to have been on that pile called 'Democratic' tickets. As the number was placed on paper by the Clerks, by order of the Inspectors, I did not charge my memory with it." "I think there were about 82 *scratched* votes—between 80 and 90. I have no idea what the relative vote between *Auld* and *Walton* on the scratched ticket was, as the tallies had not been counted by the Clerks and reported by the Inspectors. I heard the names on the scratched tickets called out." "I never on that day officially announced to any person the result of the election as to any candidate, but I did announce the number of votes headed 'American' when I returned them to the box, which number was taken down by the Clerks; but I do not remember what that number was."

Examined on another occassion, *Mr. Christy* says, "The State ticket had been counted before the destruction of the boxes, and divided into three piles, one headed by *Derbigny*, the other by *Wickliffe*, the third the *split* tickets, which last pile was large and had to be tallied and each name called. Witness suggested to the Clerks to go on and carry out and add these tallies whilst the Commissioners counted the votes for Justice and Constable, which was done." "Witness did not, nor did he hear any of the other Judges ask the Clerks if they had finished their tally, and what the result was, before the destruction of the box; but he heard remarked in conversation around him, (does not know by whom, as he was engaged in counting,) that the result would be on the general ticket, about 213 majority for *Wickliffe*, and about 250 majority for *Bell*."

*C. H. Horton* says, "There is no fact or circumstance of that election that I am aware of, by which the actual vote of any of the candidates can be known by me. I have no information about the correctness of the counting of the straight piles of votes, and I do not know what one of the Commissioners conceded as to the correct counting of those piles. I am unable to say anything in regard to *Mr. Auld's* position, or that of any other of the candidates on the tickets relatively." "I am certain that after the tickets had been separated and counted, as described by *Colonel Christy*, they were placed, those headed 'American' in the ballot box, those headed 'Democratic' in the champagne basket, and those that were scratched in the bucket."

Examined on another occasion, *Mr. Horton* says, "The whole of the State tickets had been counted out and tallied by the Clerks. Thinks the Clerks did announce the votes for some of the candidates. Was very busy counting votes from the other boxes. Does not remember how many straight Democratic tickets had been counted. Remembers the straight American ticket was 299. Thinks the number of the straight Democratic ticket exceeded 500."

*T. J. Hitzelberger* says: "Was present at the 7th Ward when the tickets were separated into three parts. Does not know what piles contained 'straight American tickets,' and what contained 'straight Democratic tickets,' nor what contained 'scratched tickets;' but I found it impossible, from the extreme rapidity with which the tickets were passed from the ballot box, to ascertain whether the tickets were straight Democratic tickets or straight American tic-

kets. They were headed, however, Democratic and American tickets respectively, and as such counted." "To the best of my recollection, after the separation of the tickets, the American tickets and the scratched tickets were returned to the ballot box, the Democratic tickets being left in the champagne basket. I supervised the counting of the Democratic tickets by *Samuel Locke*, having previously called the attention of Commissioners *Christy* and *Horton* to the necessity of such supervision."

" The tickets were separated, as I understood, with a view to ascertain the approximate result of the election, to gratify public curiosity, and not with a view to an accurate and final result of the election. The separation was made solely to ascertain approximation to the gubernatorial vote."

These copious extracts from the testimony are believed to contain all that the record shows, which is material, in relation to the counting of the vote at the 7th precinct, at the election of the 5th November, 1855.

In connection with the testimony of *Mitchell* and *Raney*, we must not omit, however, to mention that there is in evidence a memorandum which those gentlemen, with a very commendable regard to their duty as sworn Clerks of the election, and to the rights of their fellow-citizens interested in this election as voters or as candidates, made and signed by comparing their recollections of the lists of voters and the tallies which had been destroyed, on the very next day succeeding the election. This memorandum commences by giving the exact vote polled for each of the candidates for the offices of Governor and Sheriff, at the 7th precinct, and proceeds to state the *minimum* majority of the candidates who had obtained the highest votes for each of the other offices included in what the witnesses call the State ticket. In this memorandum it is declared that the plaintiff, *W. C. Auld*, had obtained a majority, at that precinct, of not less than two hundred and twenty votes, for the office of Clerk of the Fourth District Court.

We see no reason to doubt the correctness of this memorandum. It is made by the very men who had been engaged the whole of the preceding day, from nine o'clock in the morning until twelve o'clock at night, in recording the votes received and in tallying the votes counted. It is proved that the vote for Governor and for Sheriff (which two offices excited a more general interest than the others) had been definitively ascertained and announced before the destruction of the ballots and tallies. It is proved that the contest was between two party nominations for fourteen distinct classes of office, besides those of Governor and Sheriff, and to be filled (so far as the vote of the 7th precinct was concerned) by twenty-five individuals, whose names might be, and in most cases were, all included in each ticket polled, in addition to those of the candidates for Governor and for Sheriff. It is proved that, in order to avoid the enormous fatigue and delay of going through every one of nearly a thousand tickets, name by name, (or proclaiming and tallying twenty-five thousand names separately,) the Commissioners at this precinct had adopted a mode of operation which, it is also proved, was followed at the other precincts, which have made returns whose correctness is not disputed, namely: to cull out from the mass of ballots all those of a strictly party character; to distribute such into two piles, according to the party for which they were respectively cast; to put all the ballots which did not contain a complete or unmixed list of the nominees of the parties engaged in the contest, in a third pile; after such distribution of the ballots, to count each ticket in the party piles, as a vote for each nominee of

AULD
*v.*
WALTON.

the party in whose pile it was found; and only to call off, name by name, the tickets in the third pile, whose mixed character rendered its minute verification a matter of unavoidable necessity. It is proved that this mode of operation, thus adopted, was carried out by the Commissioners at this precinct; that, of the 894 ballots polled and deposited in the "State" ballot box, 509 were assigned to the "Democratic" pile, 299 to the "American" pile, 85 to the "split" or "scratched" pile, and that one ticket was a blank paper; that 509 votes were therefore assigned to each candidate (besides Governor and Sheriff) on the "State" ticket of the Democratic party, and 299 to each candidate on the "State" ticket of the American party; that the "split" tickets were called off, and the votes tallied name by name.

It is proved that, after the count of the "State" ticket, made and recorded in the mode just described, the ballots, or a portion of them, were restored to the "State" ballot box; and the Commissioners proceeded to open the "Justice's" ballot box, and to make a similar distribution into three piles of the ballots polled for Justice of the Peace and Constable, preparatory to a count of the vote for those officers.

It is proved that while the Commissioners were engaged in distributing the ballots for Justice of the Peace and Constable, the Clerks added up, compared, and extended the result of their tallies of the vote for each candidate upon the "State" ticket, as a fact accomplished, and in accordance with the expressed intentions of the Commissioners.

Under these circumstances, when the irruption of the mob had annihilated the record which the law had provided, it was an effort of memory, not a matter of conjecture, on the part of the Clerks of election for the 7th precinct, to establish the exact majority which the highest competitor for each office on the "State" ticket had obtained. They lost no time in taxing their memory for that purpose, and in consigning the majorities to paper, after consultation with each other, before intervening days and nights, and the routine of the ordinary pursuits of life, had effaced or dimmed the freshness of their recollection of the exciting events in which they had participated. Of those events, the tally and its addition were not only the most interesting, as being the consummation to which everything else tended, but were also the events with which the two signers of this memorandum had, of all the actors in the scene, the most intimate connection. They were, emphatically, their own work. And the effort of memory, which reproduced the majorities, were not, in reality, so great as it might seem at first blush. The two Clerks were only obliged to recall the addition of the several names on the eighty-four "scratched" tickets, being less than one-tenth of the whole number of votes cast.

Finally, the two Clerks concur in testifying to the correctness of the memorandum thus made to replace the tallies destroyed. · On this subject, *Mitchell*, examined in this cause on the 19th January, 1856, says: "I carried out the tallies on the split ticket. I made a memorandum to the best of my recollection. I cannot recollect the exact majority of each candidate. I made the memorandum the next morning after the election. That memorandum was made by *Mr. Raney* and myself."

[The memorandum was here shown to the witness.] "When I presented the memorandum to *Mr. Raney*, I asked·him if his recollection corroborated mine, and if the majorities put down on that paper were correct. I informed *Mr. Raney* that I intended to show the memorandum to *Colonel Christy* and the other Commissioners, with a view to have a return made."

The witness *Raney* says, on the same point: "Being shown the original memorandum filed in the 6th District Court as document B, says that his signature thereto is genuine. *Mr. Mitchell* and myself met on Tuesday morning after the election. We had a conversation in regard to the majorities. We agreed in regard to the majorities, with the exception of one name, that of *Col. Marks;* and after my explaining to him, he then agreed that I was right. I told him that we had better get together and make out a statement, our memory being then fresh. He then said he would prepare a memorandum of the majority, and present it to me for examination, and on Wednesday morning, after examining it carefully, I signed it, and it is the same memorandum filed in the 6th District Court and marded "B." That memorandum is a correct statement of the majorities for each candidate, according to my recollection at the time. I am positive that the statement in the memorandum is the lowest number, and when *Mr. Mitchell* and I could not agree we took the lowest ebb. I told *Mr. Mitchell* at the time that *Mr. Auld's* majority was twenty votes more than it is given in the memorandum."

The court has marked with satisfaction that no objection was made to the introduction of this parol evidence, to supply the place of the ballots and tallies destroyed. It affords a proof, if any were required, of the detestation which the respectable defendant and his eminent counsel entertain for any attempt, through violence, to pervert or defeat the exercise of the right of suffrage.

The sovereign, in this land, is the people, and the ballot is the expression of the sovereign will. The audacious criminal who lays the hand of violence upon the ballot box, in effect usurps the sovereinty of the country. Wherever, therefore, a case of such attempted usurpation is presented, the tribunals charged with the jurisdiction of contested elections should avail themselves of every legal means within their reach, to ascertain whether the popular will has been expressed through the ballot box ; and if so, what it has decreed.

In summing up the evidence of the occurrences at the 7th precinct, a wish to avoid adding to the otherwise, perhaps, excessive length of this decision, has alone prevented us from commenting on the discrepancies in the testimony of some of the witnesses. We have contented ourselves with recapitulating the material portions of their depositions, and giving our carefully considered conclusions. We will observe that some of the apparent contradictions are not, in reality, so much differences of fact as differences of inference from facts ; and that, where there exists a real and substantial variance in a matter of fact, the court is bound to attach more weight to a precise and positive affirmation, than to a negation founded upon a memory, either avowedly or obviously defective.

The record contains evidence of a ticket, printed and circulated in considerable quantities on the day of election, which contained the names of "Democratic" candidates for all the State offices, and the "American" candidates for all the parish offices, including Clerks of Courts; also of another ticket, which was throughout "Democratic," with the exception of the Clerk of the Fourth District Court, for which office it had *Walton's* name instead of *Auld*; and it is argued that some of these tickets might possibly have been counted at the 7th precinct as "straight Democratic" tickets. On this point it is only necessary to say, that not a single ticket of either of these descriptions is proved to have been voted at the 7th precinct. We conclude, therefore, that the plaintiff is entitled to count a majority of two hundred and twenty votes, at the 7th precinct, in addition to his vote as certified in the official returns to the Sheriff,

in evidence. This is sufficient to overcome the majority of two hundred and two votes for defendant, shown by the official returns, and to convert the result of the election into a majority of eighteen votes for plaintiff.

The ballot box was also broken in the 9th precinct, and the ballots, &c., de-destroyed. In this precinct, differently from what occurred at the 7th, the Commissioners, after the polls were closed, commenced by counting the ballots for Justice and Constable. Having finished that box, and ascertained the result, (of which they have made a return,) the Commissioners opened the "State box," and commenced distributing the tickets into piles, as at the 7th precinct. They had gone so far with this operation as to count and announce 198 "straight American" tickets, which finished that pile. They then commenced counting the "straight Democratic" tickets, and had got as far, according to some, as 100, and according to others, as 160, when a mob rushed in and destroyed ballots, ballot boxes and papers, as at the 7th precinct. The evidence as to the state of the poll at the 9th precinct rests, therefore, very much on conjecture; but we are spared the labor of scrutinizing that evidence, inasmuch as no witness, out of many who have been examined, pretends that *Mr. Walton* had a majority over *Mr. Auld* at that poll. The official return shows a majority of twenty-one for the "Democratic" candidate for Justice of the Peace at the 9th precinct, and the *conjectured* majority of plaintiff over defendant is stated by none of the witnesses at a lower figure, and by most of them at a much higher one.

The great bulk of this monstrously voluminous record is composed of evidence in relation to votes tendered at all the different precincts for plaintiff, and rejected by the Commissioners of Election. In relation to these, it has been argued upon authority, by the counsel of defendant, that under the system of voting by ballot, rejected votes cannot be counted for the candidate who received a minority of the votes actually cast. Did we go into the inquiry of the propriety of the rejection of these votes, we would have to consider and decide a variety of grave and intricate questions of constitutional and statute law, which have been elaborately argued by the learned counsel on both sides, with a research and ability which challenge our admiration. But in the view that *we* have taken of this cause, it is not necessary that we should express any opinion upon the admissibility or effect of the proof as to the rejected votes. We find that a majority of the votes actually received were cast for the plaintiff and contestant. He is therefore entitled to the office.

It is proper to remark, that the defendant offered no evidence in the court below in support of the allegation of his answer: "That his majority would have been largely increased had not the Commissioners of Election received the votes, for the plaintiff, *W. C. Auld*, of persons that were not legally naturalized and had no right to vote."

And here we might terminate. The settlement of the controversy between these parties demands no more. But the holy mission of restoring tranquility to an agitated community is ours. The Acts of 1856, which have conferred upon this court an appellate jurisdiction in matters of contested elections, give us the authority, and the alarming state of things which this record discloses makes it our duty, to expound what we conceive to be the rules laid down by the legislative will for government of those citizens who may in future be called to fulfil the irksome and invidious, no less than important, functions of Commissioners of Election in New Orleans.

Whatever may have been the authority of a Commissioner of Election, under the law as it existed on the 5th November, 1855, to inquire into the evidences of citizenship of a voter (upon which we forbear to express any opinion,) he certainly has no such authority as the law now stands.

The 11th Article of the State Constitution reads as follows: "The Legislature shall provide by law that the names and residence of the qualified electors of the city of New Orleans shall be registered in order to entitle them to vote, but the registry shall be free of cost to the elector."

In obedience to this constitutional injunction the Legislature has passed the Act, approved the 20th March, 1856, entitled "An Act providing for the registry of the names and residence of all the qualified electors of the city of New Orleans, according to Article eleven of the Constitution of the State."

By the provisions of this Act an officer is created, with a salary equal to that of a Judge of the Supreme Court, having authority to receive and consider the proof of citizenship of any person ambitious of possessing and exercising the elective franchise in New Orleans; and upon such proof being made, according to certain rules and forms of evidence fully set forth in the statute, to enregister the name of the applicant as a qualified elector, and to deliver to him a certificate, setting forth, if a naturalized citizen, the particulars of his naturalization and the proof by which it has been established. This certificate is by law full proof of the right to vote, at the day of its date, of the person who is named in it; and no person whatever can vote in New Orleans unless he is the bearer of a certificate of registry.

Section 20th enacts: "That from and after the first Monday of October next (1856) any person having complied with the provisions of this Act shall be entitled to vote, and whenever the right of any person shall be challenged at the polls, the certificate of registry issued to such person shall be held conclusive of the right of said person to vote, and no Commissioner or Commissioners of Election shall require, under the pains and penalties imposed by the sixteenth section of this Act, any other evidence of the right of such person to vote, except that portion of the oath prescribed by Article ninetieth of the Constitution respecting duelling, and the following oath or affirmation, viz: "You solemnly swear (or affirm) that you are the the identical person described in and to whom this certificate was issued, and that you are not a soldier, seaman or marine in the army or navy of the United States, nor under conviction of crime punishable by hard labor, or a pauper."

"Section 21. Be it further enacted, That no person shall be entitled to vote who shall not have registered his name in pursuance with the provisions of this Act."

We view the office of Registry, under this statute, as a special tribunal for the trial of the right to vote in New Orleans, whose certificate is in the nature of a judgment, which is not subject to revision by the Commissioners of Election.

We do not hold, however, the judgments of that tribunal to be without appeal. The 9th section of the Act provides a mode of redress, by suit against the Register, for an applicant to whom the Register shall refuse a certificate. And the validity of the certificate, and the sufficiency of the proof upon which it was based, may in all cases be examined, upon a contest of an election, by the tribunals seized of the jurisdiction of such contest.

AULD
v.
WALTON.

We also hold that, where the registry of the voter is more than three months old, and there is no change of domicil endorsed on the certificate, the vote may be challenged on the ground that the voter has changed his domicil since the date of the registry, and by such change of domicil lost his vote in that precinct; and upon such challenge being made, the Commissioners of Election may lawfully swear the voter as to the fact of his change of domicil. For, although the certificate of registry be, under the 20th section, conclusive proof to the Commissioners of the residence of the voter in the precinct at the date of the registry; and although, by Section seven and eight of the Registry Act, it is the duty of the voter to notify the Register of a change of domicil, and to have the same endorsed on his certificate of registry, yet it may be that a voter who has changed his domicil has neglected this formality.

We confidently expect that this exposition of the principles of the election law in New Orleans, emanating from an authority of the last resort, will command the respect and acquiescence of all; that the actions of the Commissioners of Election will thereby be rendered uniform and easy of performance; and finally, what is of paramount importance, that disorder will thereby be effectually prevented.

For the reasons above given, it is ordered, adjudged and decreed, that the judgment of the District Court upon the verdict of the jury be reversed, and that there be judgment in favor of the plaintiff and appellant, *William C. Auld*, decreeing him, the said *Auld*, to be entitled to the office of Clerk of the Fourth District Court of New Orleans.

MERRICK, C. J.   In the limited time I have been able to devote to the voluminous record in this case, I have not been able to satisfy myself fully of the accuracy of the conclusions of the majority of the court; nevertheless I am unwilling to dissent or to delay the decision of this important cause upon a question of fact upon which my colleagues are unanimous.